**RAY and PURINISESE McMOORE, Plaintiffs**

**v.**

**NATIONAL PACIFIC INSURANCE LTD., Defendant**

High Court of American Samoa
Trial Division

CA No. 31-93

November 29, 1994

Before KRUSE, Chief Justice, TAUANU`U, Chief Associate Judge, and ATIULAGI, Associate Judge.

Counsel:      For Plaintiffs, Togiola T.A. Tulafono
              For Defendant, Roy J. D. Hall, Jr.

INTRODUCTION

Plaintiffs are husband and wife and are residents of Iliili, American

Samoa. Defendant, National Pacific Insurance Ltd., is an insurance company duly licensed to sell various forms of insurance in the territory. At all relevant times, plaintiffs' home, a two-story concrete frame structure with the first floor largely unenclosed, was insured by defendant against fire and cyclone damage for the sum of $100,000. In December 1991, the home suffered considerable damage as a result of Hurricane Val. On March 18, 1993, plaintiffs filed suit for the full amount of the policy, contending "total loss" to their home which they claim was rendered structurally unsound by the hurricane. Their complaint further prays for interest and attorneys fees.[1]

Defendant, on the other hand, claims that plaintiffs' home was structurally defective even before the hurricane because it was inadequately designed and poorly constructed. In the way of a settlement offer, defendant tendered with the Clerk of Courts on April 1, 1993, payment in the sum of $17,597.00.

Following the storm, defendant employed Mr. Hamish Thew, an off-island loss adjustor, to examine its hurricane Val claims exposure, including plaintiffs' loss. Mr. Thew testified that he was trained and qualified in the United Kingdom as a "surveyor," and that he became a member of the

---

[1] Although plaintiffs' complaint contains a prayer for relief to this end, these claims were not addressed at trial. We express no opinion on these matters save to note A.S.C.A. § 29.1577, which provides in pertinent part:

> In all cases where loss occurs and the insurer liable therefor fails to pay the same within the time specified in the policy, after demand [is] made therefor, the insurer is liable to pay the holder on the policy, in addition to the amount of such loss, 12% damages on the amount of loss, together with all reasonable attorney's fees for the prosecution and collection of the loss, the attorney's fees to be taxed by the court . . . as part of costs . . .

The statute seems to be punitive, rather than compensatory, in design. It seems to require a showing as to when the policy becomes due and payable under its terms, and that a "demand" has been made. Furthermore, the enactment talks about attorney's fees being "reasonable." On the premise that the statute is punitive in nature, some showing of fault or bad faith on the part of insurer would seem to be envisaged.

Royal Chartered Institute of Surveyors. He further explained that as a surveyor, he is involved in the building industry in the estimation of both quantity and cost of material needed for any given building project. With regard to plaintiffs' loss, Mr. Thew testified that he had undertaken a "measured" estimate of what he perceived as storm-related damage and calculated plaintiffs' repair costs to be $19,552. He further testified that his figures reflected his own assessment of needed labor costs, as well as his estimation of material costs based on price lists that he had obtained from one of the local builder's suppliers.

Plaintiffs, on the other hand, engaged architect Joe N. Weilenman, formerly head of the Architectural and Engineering Division of the Department of Public Works but presently in private practice, to assess their storm damage. Mr. Weilenman appraised plaintiffs' repair costs at $49,640.00, using a "percentage evaluation" of damage method (versus a "detailed quantity take off of items damaged") because of what he viewed as extensive damage to the roof and second floor area. He found the house to be 45 percent damaged and arrived at his repair estimate figure using $30.00 per square foot on overall basis, the local building industry's considered norm at the time.

Additionally, Mr. Weilenman noted, in his initial report dated December 24, 1991, that some of the concrete beams supporting the second floor were cracked above the columns. He speculated that the cracks could have been the result of "excessive deflection" caused by the storm, but he could not positively say so since he also found that "the beams [were] not cracked at mid-span," where, according to his testimony at trial, cracking is prone to occur with deflection. His report further stated that if "the cracks . . . are definately [sic] attritable [sic] to this disaster and are deemed to have significantly weakened the structure, the percentage of damage would be higher."

One year later, Mr. Weilenman was asked to look at the beams again. This time, he found two cracks "at mid-span," along with those he had previously located above the columns. In his second report, dated February 4, 1992, he stressed that the "immediate structural effects have not been investigated," and concluded that a definitive answer to the question as to whether the cracks were storm-related or not could only be resolved with extensive investigation and testing of the structure.

## DISCUSSION

The issue here is whether the structural unsoundness of plaintiffs' home

33

was storm-related or not. Nothing restorative has been done to the structure since the storm, and as it stands today, it is unsafe for rebuilding. The defendant concedes that it is liable for storm damage; however, it contests liability for pre-storm damage which it claims was gravity-related due to poor design and construction.

Plaintiff Ray McMoore testified that there were no cracks in the beams prior to hurricane Val. He stated that he used to spend a lot of time sitting on the ground floor and that he had never noticed any cracks at all on the beams until after the storm. He further testified that he was in the house during hurricane Val as well as the previous hurricane Ofa, and that hurricane Val appeared to him to be the worse experience. He alluded to "pop[ping]" sounds to the structure as hurricane Val's winds changed direction.

Mr. Weilenman theorized in his second report that if the cracks to the beams were indeed caused by the storm, they could have arisen if the storm had momentarily shifted the weight of the second floor slightly from the supporting concrete frame, and then upon release, could have resulted in deflection causing the beams to crack. At the same time, however, Mr. Weilenman also opined that since the cracks were quite small, some could have been pre-storm and not noticed before.

We find the evidence to preponderate in favor of the conclusion that the cracks above the columns, discovered by Mr. Weilenman during his first inspection, preexisted the storm. First, Mr. Weilenman testified that the structure appeared to him to be ill-designed and poorly constructed; the beams, for example, were found to be sagging at the mid-span. Mr. Thew also made averments regarding the substandard quality of the construction. Second, Mr. Weilenman opined that cracks resulting from excessive deflection are more likely to appear at mid-beam. In this regard, we find it significant that Mr. Weilenman had failed to see any sign of mid-beam cracking during his first inspection immediately after the storm. This seems to suggest that the two mid-beam cracks that Mr. Weilenman located one year after the storm were more likely the result of subsequent deterioration. As Mr. Weilenman noted in his second report, "[c]racks in concrete beams in this environment do accelerate the deterioration of the steel over a period of time." Thus the structure's extended post-storm exposure to the elements and its consequent deterioration would have further aggravated the structural unsoundness of the concrete frame, which both Mr. Weilenman and Mr. Thew agree cannot be safely rebuilt upon as it stands today.

34

Third, the evidence also disclosed "creeping" in the beams, causing them to bend in toward the middle. While this is usually attributed to gravity because of ill-design, Mr. Weilenman did also suggest that sagging form-work could possibly explain creeping in an otherwise properly designed structure. As to this possibility, however, Mr. Weilenman was careful to add that he had no comment as to adequacy of the structure's design, as he was not a party to the design work nor was he present during the building of the structure. We parenthetically add that while the law requires that all design work be submitted for approval by the Public Works Department's Engineering Division--previously headed by Mr. Weilenman--we were not told why the plans for plaintiffs' home were not, or could not have been, produced for appropriate review in anticipation of trial.

Finally, although Mr. Ray McMoore may not have noticed any cracks in the beams prior to hurricane Val, this does not necessarily mean, as Mr. Weilenman conceded, that there were no pre-storm cracks. As the latter further attested, the cracks found were "small to hairline" and he had to look closely to see them.

On the issue of damages, we are required to compare the diverging opinions of two trained professionals, which is a difficult, but necessary part of our task as factfinders. We find that plaintiffs' storm related damages are more likely in the vicinity of Mr. Weilenman's assessment, as opposed to defendant's calculation of $19,552. In our view, the damage sustained was extensive and Mr. Weilenman's assessment, using the local building industry's cost per square foot yardstick, better takes into account the vagaries of the available local labor market skills at the time of loss, as well as the sort of latent damage which necessarily accrues with extensive water damage--a thoroughly soaked second floor, the need to check all electrical wiring and connections, expected warping, delamination, rusting of fasteners, as well as general deterioration. We accordingly fix plaintiffs' storm-related damages at $50,000.

Judgment will enter in favor of plaintiffs Ray and Purinisese McMoore against the defendant National Pacific Insurance Ltd. in the amount of $50,000.

It is so ordered.